142 So. 544

## REED & CATES et al. v. BARNES.

### 6 Div. 992.

Supreme Court of Alabama.

June 9, 1932.

Fort, Beddow & Ray, of Birmingham, for appellants.

Crampton Harris, of Birmingham, for appellee.

BROWN, J.

This action is by the plaintiff, the personal representative of the estate of Elbert Barnes, under section 5696 of the Code, for the wrongful death of the plaintiff's intestate.

The defendants had the affirmative charge in their favor on counts 1 and 3, ascribing the death of said intestate to the negligence of the defendants.

Like charges were requested in writing by defendants as to counts 2 and 4, were refused by the court, and the case was submitted to the jury on the issues presented by said counts and the plea of the general issue.

Count 2 avers that: "Plaintiff's intestate while riding on the truck of the defendants *with the knowledge, agency and consent of the defendants*, where he had the right to be and was not a trespasser, * * * said truck was caused to be turned over and kill plaintiff's intestate, * * * that the death of his intestate was proximately caused by the wanton, wilful, or intentional conduct of the defendants' servants or agents while acting within the line and scope of their employment, which wanton, wilful or intentional conduct consisted in this, said servants or agents wantonly, wilfully, or intentionally caused said truck to turn over, with the knowledge intestate would probably be injured thereby and with reckless disregard of the consequences." (Italics supplied.)

Count 4 alleges that: "Plaintiff's intestate was killed by a truck in Shelby County, State of Alabama * * * the death of his intestate was proximately caused by the wanton, wilful, or intentional conduct of defendants' servants or agents, while acting within the line and scope of their employment, which wanton, wilful, intentional conduct consisted in this, said servants or agents wantonly, wilfully or intentionally caused said truck to kill intestate."

The evidence shows that the defendants Reed & Cates, a partnership composed of Thomas Reed and Cecil Cates, at the time of the death of plaintiff's intestate, and for some time prior thereto, were engaged in transporting dairy products by truck from different points in Alabama to Birmingham; that on the day of the death of said intestate one of defendant's trucks in charge of Reed was returning to Birmingham with a usual load taken on in the vicinity of Lowndesboro; that the truck turned over on the highway a short distance from Saginaw; that it was raining and about 9 o'clock at night. The mangled body of plaintiff's intestate, a boy about fifteen years of age, was found in the wreck by persons who went to the scene soon after the wreck.

Reed, testifying as a witness for the defendant, being asked to state how the wreck happened, after making a diagram of the locus in quo, showing that the highway curved to the left, testified:

"This is down-grade here (indicating) and is down-grade for practically a half a mile. It is not a steep grade; it is a gradual slope, and I was coming down here at about the ordinary rate of speed, I judge 25 miles an hour, and evidently on coming around the curve I swung a little to this side, and I got back—you ask me which side I mean; a little too far to the right side, and I got back too quick, a little quicker than I should, and the back end of the truck slid—I felt the back end slide, and that is the last I remember.

"You ask me how long did it take it to happen; the whole thing, as far as I can recollect: Not very long. You ask me if I know whether I got off on the right hand side of the road or not: I don't know.

"My front lights were on the curve, but further straight ahead they wouldn't be on the highway. You ask me what effect does it have on lights on an automobile or truck when

it is raining, whether it broadens or narrows your vision: Well, it will broaden your vision and cut it short and you won't see so far ahead.

"You ask me if there was anything that got in my way that I know of: Not to my knowledge. Nothing happened to the truck that I know of. I don't know what caused the wreck. I was in the truck; I didn't hurt myself on purpose. I got hurt, yes, sir. It broke three or four of my ribs and I hit the side of my head there (indicating). However, it didn't disfigure it, but I felt the pain there for probably three weeks on my head. And it affected the side [sight] of my left eye. I was not drinking, no, sir. You ask me what did I do or did I fail to do that caused the wreck or what did I do to stop it, or how did it happen. When I felt the back end slide I slapped on the brakes—the impulse as you step on the brakes—and about the time I got my foot onto the brakes, that is the last I remember. * * *

"You ask me if I can give the jury any idea as to how far the truck traveled in the whole process of the turn-over: Well, I judge about the length of this room, because it slid and the back end turned around, and it would take about the length of this room to do that in, to the best of my knowledge. The first thing I felt was the back end sliding. I don't know whether I got off on soft ground or not. It was a dark night. I was not getting out of the way to let anybody pass, or anything like that. There was a truck ahead of me, but not right close.

"You ask me if I was laughing and kidding anybody and having a lot of fun, or if I was just driving along steady: I was just driving along. You ask me if I used my judgment after I got into a tight the best I knew how to get out of it, and extricate myself from it to keep from turning over: Naturally, I would, but it all happened so quickly that I didn't have time to hardly think. I did what I could, of course."

The evidence further showed that several concrete posts bound together by a cable on the side of the highway were either pushed over or broken off. The weight of the truck, with the load, was shown to be from ten to eleven thousand pounds, and some of the milk cans, by the force of the impact, were thrown into the field on the road side, and one of the front tires on the truck was cut through and deflated.

The body of plaintiff's intestate was found with the cable attached to the broken posts, lying across it.

By a stipulation of fact, "it was admitted by counsel for defendant that the deceased was riding on the truck at the time of the accident"; but when and under what circumstances he got on the truck is not shown; nor does it appear in evidence, affirmatively or by inference, that Reed, the driver of the truck, had any knowledge that he was on the truck, or that intestate boarded the truck with Reed's knowledge or consent. Intestate was a mere trespasser.

There is nothing in these circumstances, though it be conceded that the evidence afforded an inference that the truck was traveling at a greater rate of speed than testified to by Reed, that justifies the conclusion that the driver of the truck was guilty of wanton, willful, or intentional conduct, proximately causing the death of plaintiff's intestate.

The defendants were, therefore, entitled to the affirmative charge. Crider v. Yolande Coal & Coke Co., 206 Ala. 71, 89 So. 285; Perry Supply Co. v. Brown, 221 Ala. 290, 128 So. 227.

For the error in refusing charges 2 and C, the judgment of the circuit court is reversed.

Reversed and remanded.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.